**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **v.** | ) | **CRIMINAL NO.: 07-CR-00107-ML** |
| **PATRICK CLYNE,** **Defendant.** | ) | |

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S OBJECTION TO A TWO-LEVEL ENHANCEMENT PURSUANT TO SECTION 3B1.3 OF THE ADVISORY GUIDELINES

Defendant Patrick Clyne, by and through undersigned counsel, submits this Memorandum of Law in support of his objection to a two-level enhancement, pursuant to U.S.S.G. § 3B1.3, for an alleged abuse of position of trust or use of a special skill. Specifically, Mr. Clyne objects to the application of this enhancement because he did not use his skills as an electrician to commit the mail fraud and tax evasion offenses at issue. Moreover, his position initially as Fire Safety Electrician was a blue-collar non-exempt position that later became an administrative salaried position but was never a professional or managerial position characterized by substantial discretionary judgment. Accordingly, because Mr. Clyne did not hold a position of trust or use a special skill as those terms are defined in the Advisory Guidelines a two-level enhancement pursuant to U.S.S.G. § 3B1.3 is not appropriate in this case.

## PROCEDURAL BACKGROUND

During plea negotiations in this case, undersigned counsel and counsel for the government discussed U.S.S.G. § 3B1.3. At no time during plea negotiations did counsel for the government assert that U.S.S.G. § 3B1.3 was applicable in this case. Moreover, at no time during the plea negotiations in this case did counsel for the government express his belief that the facts in this case

would support a § 3B1.3 enhancement in this case. At no time did he include this enhancement in any draft of the plea agreement.

Now the Probation Officer alleges in the Presentence Report (paragraph 21) that the two-level role adjustment contained in U.S.S.G. § 3B1.3 is applicable in this case. And, the Probation Officer's assertion is based on the version of the offense that was drafted by the government and inserted verbatim by the Probation Officer into the original Presentence Report (hereinafter "PSR"). Apparently, no independent investigation of the government's version of the facts is conducted by the Probation Office in this district.

After Clyne objected to the Probation Officer's position, the government apparently supplemented its original factual version of the offense by informing the Probation Officer that Clyne was not supervised by anyone at a higher level. In the final version of the Presentence Report the Probation Officer added the following sentence to paragraph 21: "His actions were not supervised by anyone at a higher level." However, this change was not included in the Addendum to the PSR. Rather, the Probation Officer informed undersigned counsel of this change in a letter dated October 25, 2007, in which the Probation Officer stated: "Lastly, based upon additional information received regarding the offense, a sentence was added to paragraph 21 which states that the defendant was not supervised by anyone at a higher level." Again, no independent investigation regarding this allegation was conducted by the Probation Officer. The Probation Officer simply inserted the government's new factual allegation into the PSR.

Clyne disputes both the government's factual allegation of no supervision and notes that this fact was not admitted by Clyne at the time of his plea. More importantly, throughout the time Clyne was employed by RISD he reported to and was supervised by the Director of Public Safety.

Clyne also objects to the legal conclusion that the facts alleged in the PSR are sufficient to apply § 3B1.1. In addition, Clyne objects to the government taking the position that § 3B1.1 now applies based on a version of the offense written by the government without review or comment by undersigned counsel and inserted verbatim into the Presentence Report. Finally, Clyne objects to the government's manipulation of the sentencing guidelines by adding a "no supervision" fact to the PSR after defendant's objection that is not supported in the record, was not admitted by Clyne during his plea hearing and, most importantly, is untrue.

FIRE SAFETY ELECTRICIAN POSITION

On or about May 27, 1997, Paul V. Timmins, Director of Public Safety at the Rhode Island School of Design (hereinafter "RISD"), offered defendant Patrick Clyne (hereinafter "Clyne") a full-time 40-hour a week position of Fire Safety Electrician at RISD with a starting hourly rate of $14.50 per hour, which Clyne accepted. See Memorandum to Denise Geoffrey from Paul Timmins dated May 27, 2007 attached hereto as Exhibit "A". The description of the position of Fire Safety Electrician that apparently was advertised in the Providence Journal stated that the responsibilities for the position were the following: "Perform and oversee the maintenance, testing and improvement of all fire safety and security systems on campus, including detection systems, intrusion alarms, emergency and exit lighting." See Fire Safety Electrician Advertisement with note to Paul from Rae Ann (employee in RISD Human Resources Department) attached hereto as Exhibit "B". The minimum requirements for the position, as advertised, was a "R.I. Journeyman's license with R.I. Fire Alarm Technician license *or* R.I. Master's license preferred; will consider Fire Alarm Technician license with exceptional experience." Id.

In a letter dated June 18, 1997, from Kathleen M. Alvino, Director of Human Resources at RISD to Clyne the position of Fire Safety Electrician was described as a "non-exempt, grade 03/PS

position, scheduled for 40 hours per week, with an hourly rate of $14.50 paid on a bi-weekly basis. See Letter to Patrick Clyne from Kathleen M. Alvino attached hereto as Exhibit "C". This letter further provided:

> All non-exempt employees are subject to a three month probationary period which will focus on your job performance. The probationary period can be extended at the discretion of the supervisor. You will be eligible for a performance and merit increase review one year from the date of hire upon successful completion of your probationary period. Id.

Clyne began working in this non-exempt grade 3 position of Fire Safety Electrician on June 16, 1997. See Human Resources Department Memorandum dated June 19, 1997 attached hereto as Exhibit "D".

The term non-exempt is a term of art in the Human Resources profession that derives from the Fair Labor Standards Act (FSLA), 29 U.S.C. § 201, *et seq.* The FSLA requires employers to classify employees as either exempt or non-exempt. The FLSA requires non-exempt employees to be paid at least the federal minimum wage for all hours worked and overtime pay at the rate of time and one-half the employees' regular hourly rate for all hours worked over 40 hours in a workweek. See 29 U.S.C. § 206(a)(1) and §207(a)(1). "Non-exempt" employees under the FSLA are usually manual laborers and other "blue-collar" workers who perform work involving repetitive operations with their hands, physical skill and energy. Such non-exempt "blue collar" employees gain the skills and knowledge required for performance of their routine manual and physical work through apprenticeships and on-the-job training. An electrician is considered a non-exempt "blue collar" worker under the FSLA. See 29 C.F.R. § 541.3 (explaining why "blue collar" workers like electricians are not exempt employees).[1]

---

[1] 29 C.F.R § 541.3 provides, in pertinent part:

Conversely, an "exempt" employee is an employee who is exempt from both minimum wage and overtime pay laws because they qualify for one of the exemptions set forth in Section 13(a)(1) of the FSLA Act. See 29 U.S.C. § 213(a)(1). For example, any employee who is employed in a bona fide executive, administrative, or professional capacity, is deemed "exempt". Id.

In September 1997, Clyne was given his 3-month probationary performance appraisal by his immediate supervisor, the Director of Public Safety, Paul Timmins. Clyne's performance appraisal was subsequently reviewed by Paul Timmins' immediate supervisor, Fran Gast, Associate Vice-President for Campus Services at RISD. Mr. Timmins' review of Clyne was quite complimentary. Moreover, this 3-month performance appraisal also identifies which skills were deemed critical by Clyne's immediate supervisor by placing a check mark next to the skill. In Clyne's case, the skills that his supervisor deemed critical for Clyne to fulfill his basic job responsibilities included: (1) accurately performs job tasks and assignments; (2) adheres to and remains knowledgeable of safety regulations, using safety equipment as needed, (3) cooperative and works effectively with others; (4) exhibits good interpersonal skills; (5) demonstrates adaptability to changing priorities; (5) determines priorities and systematically carries them out. Mr. Timmins also commented that "[I]n a

---

(a) The [§ 213(a)(1)] exemptions and the regulations in this part do not apply to manual laborers or other ``blue collar'' workers who perform work involving repetitive operations with their hands, physical skill and energy. Such non-exempt ``blue collar'' employees gain the skills and knowledge required for performance of their routine manual and physical work through apprenticeships and on-the-job training, not through the prolonged course of specialized intellectual instruction required for exempt learned professional employees such as medical doctors, architects and archeologists. Thus, for example, non-management production-line employees and non-management employees in maintenance, construction and similar occupations such as carpenters, ***electricians,*** mechanics, plumbers, iron workers, craftsmen, operating engineers, longshoremen, construction workers and laborers are entitled to minimum wage and overtime premium pay under the Fair Labor Standards Act, and are not exempt under the regulations in this part no matter how highly paid they might be. (emphasis added).

short time Berney has addressed nagging alarm problems and offered ways to continue improving fire safety as RISD" and "[I]n a very short time Berney has become an important part of the Public Safety team." See Copy of 3-Month Performance Appraisal dated September 24, 1997 attached hereto as Exhibit "E". Noticeably absent is any reference to any professional or managerial duties.

At the end of his first year, Clyne received another Performance Appraisal from his supervisor, Paul Timmins, which was again complementary and identified the critical skills essential to the fulfillment of Clyne's basic job responsibilities. With respect to "problem solving functions" his supervisor wrote "Under consultation with Director, Berney is a self starter, accomplishes his work referring to a day as eight precious hours." See Portion of Performance Appraisal dated June 1998 attached hereto as Exhibit "F". Clyne also commented in a memorandum attached to this performance appraisal that "Our office is a pleasure and fun place to work in and Paul's direction, management and supervision is the reason for the absence of stress in our work place." Id. Thus, it is clear that during the first year that Clyne worked for RISD, he was a non-exempt hourly employee, who was supervised by the Director of Public Safety, and he had no managerial or professional responsibilities. This is significant because Clyne admits that his mail fraud scheme began during the first year of his employment.

The discovery produced by the government also included a document entitled "Who's Who in Campus Services at Rhode Island School of Design" with a 1998-99 date. This document states that Campus Services oversees the following areas: Purchasing and Campus Support Services, Physical Plant, Office of Public Safety, Dining & Catering Services and the RISD Store. Thus, the organizational structure set forth on this chart indicates that Clyne was a low-level employee who worked in the Office of Public Safety, that the Office of Public Safety was comprised of a Director, who coordinates public safety and security activities, an Assistant Director, who directs Quad Public

Safety Office/Details, a Secretary for Parking and Keys, a Secretary for Quad Control and finally, a Fire Safety Technician. This chart further shows that Clyne's supervisor reported to Fran Gast, Associate Vice President for Campus Services. Finally, this organizational chart shows the structure of the Office of Purchasing and Campus Support Services, which included a Director, Buyer and Purchasing Coordinator. See Copy of document entitled "Who's Who in Campus Services at Rhode Island School of Design" attached hereto as Exhibit "G".

In January 2000, there was a change in leadership in the Department of Public Safety. Paul Timmins left his position as Director and Lucette Dunlop, an experienced safety and security professional, was hired as an interim Director of Public Safety. See Memorandum from Fran Gast, Associate Vice-President for Campus Services dated January 19, 2000 attached hereto as Exhibit "H". In February 2001, upon the recommendation of Ms. Dunlop, Clyne's position was upgraded to an "administrative grade 12/AD" position and his title changed to Manager of Fire Safety. This new position made him a salaried employee (versus hourly) and his annual salary was increased to $44,500. See Letter dated February 19, 2001 from Denise M. Geoffrey, Compensation Specialist attached hereto as Exhibit "I". In this letter, Ms. Geoffrey also enclosed a "draft of the position description" for Clyne's review.

In the first Performance Appraisal completed by Clyne's supervisor, Lucette Dunlop, after his position was changed from an hourly position to a salaried position, Ms. Dunlop wrote under the category of Leadership Ability "Berney is not involved in managing the work of the unit. He is involved, however, in mapping out the work of the many vendors he supervises." Under the category of Personnel Management Skills, Ms. Dunlop also noted that these skills are not applicable to Clyne. See Performance Appraisal dated May 14, 2002 attached hereto as Exhibit "J".

The position description that was sent to Clyne in February 2001 by Ms. Geoffrey apparently went through a number of iterations over a two year period before it was finalized in April 2003. The final position description indicated that the position of Manager of Fire Safety was a full-time administrative position which reports to the Director of Public Safety. See Position Description for Manager of Fire & Life Safety dated April 2003 attached hereto as Exhibit "K", page 2 (Supervision and Scheduling Demands). The position description does not state that the position was a managerial or professional position. The position description stated that the position receives limited supervision and gives moderate supervision. However, the position description stated that only 10% of the position is to supervise work-study assistants, vendors and contractors performing installations, testing, and inspections of fire and life safety systems. The position description did not provide Clyne with any purchasing authority. Finally, the position description did not provide Clyne with any authority to authorize payment to vendors and contractors. Id.

The last Annual Performance Appraisal concerning Clyne that was contained in the discovery produced by the government was conducted by Ray McKearney, Director of Public Safety in September, 2002. Interestingly, Mr. McKearney also noted under the category of Personnel Management Skills that it was not applicable to Clyne. See Performance Appraisal dated September 5, 2002 attached hereto as Exhibit "L".

On November 7, 2005, Clyne was terminated from his position as Manager of Fire Safety for purchasing irregularities. See Letter dated November 7, 2005, to Clyne from Jack Silva, Director of Facilities and Human Resources Department Termination Report dated November 8, 2005, attached hereto as Exhibit "M".

The substance of the mail fraud charges against Clyne and the factual basis for his plea of guilty to this charge is that between October 1997 and October 2005, while employed by RISD, he

prepared invoices in the name of Ankh Electric which falsely represented that Ankh Electric performed services for RISD that, in fact, were not performed. Thereafter, Clyne marked the invoices as "OK to pay" and then forwarded them to RISD Purchasing Department. After the invoices were forwarded to RISD's Purchasing Department, Purchasing issued checks made payable to Ankh Electric and sent the checks through the mail.

However, throughout his employment with RISD, Clyne was supervised by and reported to the Director of Public Safety. He was never the "head fire safety expert" at RISD as alleged by the government. He was a fire safety electrician, who after receiving 3+ years of additional training and experience at RISD was given the title of Manager of Fire Safety, which was not a managerial or professional position, but an administrative position.

ABUSE-OF-TRUST/SPECIAL SKILL GUIDELINE

U.S.S.G. § 3B1.3 provides, in pertinent part:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by **2** levels.

Neither the original guideline nor the accompanying commentary defined the phrase "a position of public or private trust." However, the original Application Note 1, provided that the "position of trust must have contributed in some substantial way to facilitating the crime and not merely have provided an opportunity that could as easily have been afforded to other persons. This adjustment, for example, would not apply to embezzlement by an ordinary bank teller." Thus, from the beginning this guideline was never intended to apply to every fraud or embezzlement case, notwithstanding the fact that in every successful fraud case, the defendant will have created confidence and trust in the victim. United States v. Edwards, 325 F.3d 1184, 1187 (10th Cir. 2003).

In 1993 the Commission amended the commentary to § 3B1.3, effective November 1, 1993, stating its reason for the amendment that "This amendment reformulates the definition of an abuse of position of trust to better distinguish cases warranting this enhancement." See U.S.S.G. Appendix C, amendment 492. The 1993 amendment deleted the original Application Note 1, and substituted in its place the current Application Note 1, which provides:

> 1. Definition of "Public or Private Trust".—"Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

Although the 1993 Amendment did not change the basic thrust of the adjustment, the revised Application Note 1, by focusing on "private or public trust characterized by professional or managerial discretion" clearly narrowed the scope of this adjustment. Indeed, the District of Columbia Circuit has stated that "the commentary's focus on positions characterized by professional or managerial discretion places a significant limit on the types of positions subject to the abuse-of-trust enhancement." See United States v. West, 56 F.3d 216, 220 (D.C. Cir. 1995).

Before the 1993 Amendment, individuals found to occupy positions of trust included a truck driver transporting furniture and household goods convicted of theft of an interstate shipment, a bank loan clerk who transferred money to her own account from the bank's general

ledger account, and a security guard involved in the robbery of an armored car. United States v. Hill, 915 F.2d 502 (9th Cir. 1990)(truck driver transporting furniture and household goods); United States v. Ehrlich, 902 F.2d 327 (5th Cir. 1990)(bank loan clerk transferred money to her account from bank's general ledger account; adjustment deemed appropriate because position allowed her to do this and balance bank's account to hide offense); United States v. Parker, 903 F.2d 91 (2d Cir. 1990).

Before the 1993 Amendment, courts noted that the primary trait that distinguished a person in a position of trust from one who is not is the extent to which the position provides the freedom to commit a difficult-to-detect wrong. Hill, supra at 506; see also United States v. Williams, 966 F.2d 555, 557 (10th Cir. 1992)(noting that the extent to which the position provides the freedom to commit a difficult-to-detect wrong was a factor in determining whether defendant occupied a position of trust); United States v. Pardo, 25 F.3d 1187, 1192 (3rd Cir. 1994)(same).

However, the 1993 Amendment to Application Note 1 makes clear that a position of "public or private trust" is not about holding a position that gives you the freedom or opportunity to commit a difficult-to-detect wrong. Opportunity and access do not equate to authority, or to the kind of "substantial discretionary judgment that is ordinarily given considerable deference." Edwards, supra at 1187; see also, United States v. Reccko, 151 F.3d 29, 33 (1st Cir. 1998)(noting that the cases that emphasized an employee's freedom to commit wrongs that defy facile detection were decided under the earlier version of the § 3B1.3).

Rather, a position of trust refers only to a "position of … trust characterized by professional or managerial discretion which is further defined as "substantial discretionary judgment that is ordinarily given considerable deference." Persons holding such positions

ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. Examples included in the current application note are "embezzlement of a client's funds by an attorney serving as a guardian," "a bank executive's fraudulent loan scheme" or the "criminal sexual abuse of a patient by a physician under the guise of an examination." They further demonstrate the type of position of trust to which the Sentencing Commission intends this guideline to apply. The examples given in Application Note 1 (physician, attorney and fiduciary), imply that the "inherent nature of the work itself should naturally convey a substantial degree of discretion to the defendant concerning how to properly administer the property of another or otherwise act in their best interest." United States v. Tribble, 206 F.3d 634, 637 (6th Cir. 2000).

These examples, when viewed in the context of the language of Application Note 1, amply illustrate the type of professional or managerial position that is a position of public or private trust. An attorney, physician and bank executive hold positions of trust that are characterized by professional or managerial discretion in that they exercise *substantial* discretionary judgment that is *ordinarily* given considerable deference. (emphasis added). The words "substantial" and "ordinarily" are very illuminating because they make clear that a position of trust must be the type of position that not only exercises substantial discretionary judgment but also that this discretionary judgment is ordinarily given considerable deference.

An attorney, physician and bank executive are also positions that "ordinarily" are subject to "significantly less supervision" than employees whose responsibilities are primarily non-discretionary in nature. (emphasis added). Again, the terms "ordinarily" and "significantly less supervision" are critical in determining whether this guideline is applicable in this case. For a

particular position to be position of trust, it must be the type of position that is "ordinarily" subjected to "significantly less supervision" than non-managerial or non-professional positions.

Finally, the examples demonstrate how the position of an attorney, physician and bank executive contribute in a "significant" way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult). An attorney's professional status enables him to embezzle a client's funds while serving as that client's guardian. A bank executive is abusing his fiduciary duties authority when he commits or conceals a fraudulent loan scheme. A physician who sexually abuses a patient under the guise of a medical examination is abusing his professional oath to commit or conceal the crime. In each example, these professionals are subjected to "substantially less supervision" because they are professionals and fiduciaries. It is, therefore not surprising that the 10th Circuit recently noted "that the term "position of trust" is a bit of a misnomer. It actually has little to do with *trustworthiness* and everything to do with *authority* and *discretion*. See United States v. Spear, 491 F.3d 1150, 1154 (10th Cir. 2007). However, it is not any authority or any discretion. It must be the type of "substantial discretion that is ordinarily given considerable deference."

In United States v. Reccko, supra at 31, the First Circuit noted that the term "position of public or private trust" has a special meaning and that positions of trust are "characterized by significant discretion and minimal supervision." In Reccko, the First Circuit further directed sentencing courts to conduct a two-step inquiry into the possible applicability of an enhancement under § 3B1.3. First, a court must determine whether the defendant occupied a position of trust at all. If not, the inquiry ends and no enhancement applies. If, however, this initial query produces an affirmative response, a court must proceed to ascertain the extent to which the

defendant used that position to facilitate or conceal the offense. Only if the defendant abused the position of trust in a manner that significantly facilitated the commission or concealment of the offense, will the enhancement apply. See also, United States v. Scungio, 255 F.3d 11, 19 (1st Cir. 2001).

Similarly, for the special skill enhancement to apply, the government must show both that the defendant possessed a special skill and that he used that special skill "in a manner that significantly facilitated the commission or concealment of the offense." United States v. Connell, 960 F.2d 191, 198 (1st Cir. 1992); see also Scungio, supra at 19 (citing Reccko at 31).

ARGUMENT

I. DEFENDANT DID NOT USE A SPECIAL SKILL TO COMMIT THE OFFENSES AT ISSUE.

Whether Clyne's status as an electrician constituted a special skill used to facilitate the crime involves two distinct questions: (1) whether being an electrician is a special skill within the meaning of § 3B1.3; and (2) whether the skill significantly facilitated the commission or concealment of the crime. Because Clyne's electrician license is not a special skill as defined in § 3B1.3 and Clyne did not use his electrician license to commit the crimes in this case, the special skill adjustment in § 3B1.3 does not apply in this case.

A. An Electrician Is Not A "Special Skill" As Defined in U.S.S.G. Section 3B1.3.

Application Note 4 to § 3B1.3 states that a "Special Skill" refers to "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. The examples in the notes include pilots, lawyers, doctors, accountants, chemists, and demolition experts." Thus, the examples of special skills provided in the guidelines seem to require more skilled education, training and licensing than is usually associated with being an electrician (e.g., pilots, lawyers, doctors, accountants, chemists and demolition experts). Pilots,

lawyers, doctors, accountants, chemists and demolition experts all receive substantially more education, training and licensing than an electrician.

Defendant also notes that when the position of Fire Safety Electrician was advertised by RISD, a master electrician's license was "preferred" but not required for the job Clyne was hired to do. Indeed, RISD was willing to consider a Fire Alarm Technician with exceptional experience for the position of Fire Safety Electrician. See Exhibit "B".

Moreover, the only case that has considered whether an electrician's skills qualifies as a special skill is an unpublished case from the Fourth Circuit in which the court decided that an electrician's skills are not sufficiently special to qualify as special skills under § 3B1.3. See United States v. Stone, 85 Fed. Appx. 925, 2004 WL 99036 (4th Cir. 2004).[2]

Finally, skills that have been held to be "special" under this guideline have required more advanced or specialized knowledge than the skills of an electrician. Connell, supra, at 198 (registered stock broker); United States v. Wright, 211 F.3d 233, 238 (5th Cir. 2000)(certified public accountant); United States v. Ross, 190 F.3d 446, 454 (6th Cir. 1999)(attorney); United States v. Spencer, 4 F.3d 115, 120 (2d Cir. 1993)(sophisticated chemist's skills). Rather, Clyne's skills as an electrician are more akin to the skills that have been found not to be "special" under the guidelines. See United States v. Hickman, 991 F.2d 1110, 1112-13(3rd Cir. 1993)(general contractor); United States v. Young, 932 F.2d 1510, 1514(D.C. Cir. 1991) (special skill must be more than ability to commit crime); United States v. Green, 962 F.2d 938, 944 (9th Cir.

---

[2] Defendant notes that United States v. Stone was not selected for publication in the Federal Reporter. Moreover, pursuant to the Fourth Circuit's Local Rule 32.1, citations of the Circuit's unpublished dispositions issued prior to January 1, 2007, in briefs and oral arguments in the Fourth Circuit and in the district courts within the Circuit is disfavored, except for the purpose of establishing *res judicata*, estoppel or the law of the case. See Fourth Circuit Local Rule 32.1.

1992)(pre-existing printing skills not special); Scungio, supra at 19 (tax lawyer's skill not special in a false statements case).

B. Defendant Did Not Use His Skills As An Electrician To Commit The Mail Fraud and Tax Evasion Offenses At Issue.

Also, Clyne did not use his skills as an electrician to "significantly" facilitate the commission or concealment of the crime at issue. See Connell, supra at 198 (special skill enhancement applies only if the defendant employed a 'special skill' not possessed by the general public to facilitate the commission or concealment of a crime). Indeed, with respect to the tax evasion offense, neither the government nor the Probation Officer have argued that Clyne used his skills as an electrician to commit or conceal his tax evasion charges. Moreover, with respect to the mail fraud offense, Clyne's skills as an electrician did not "significantly" facilitate the crime or its concealment.

Rather, it was Clyne's knowledge of the Purchasing Department's lax procedures concerning payments of outside vendors which provided him with the opportunity to commit the mail fraud offense. Indeed, just like the tax lawyer in the Scungio case, whose special skill as a tax lawyer had no bearing on the commission of a false statement to the IRS, Clyne's skills as an electrician did not significantly facilitate his mail fraud offense. Accordingly, a two-level special skill enhancement is not appropriate in this case.

II. DEFENDANT DID NOT OCCUPY A POSITION OF PUBLIC OR PRIVATE TRUST CHARACTERIZED BY PROFESSIONAL OR MANAGERIAL DISCRETION.

A. Defendant's Position As Fire Safety Electrician Was A "Blue-Collar and Administrative Position. It Was Not A Professional or Managerial Position.

In Reccko, the First Circuit made clear that the first step in determining whether a defendant abused a position of public or private trust is to determine whether the person held a

position of a trust at all. In Reccko, the district court incorrectly determined that the defendant, a switchboard operator at a municipal police headquarters, held a position of trust precisely because her job provided her with access to information that enabled her to commit the charged crime (unlawfully tipping off a suspect to an impending raid). In Reccko, the district court reasoned that because the defendant was exposed to sensitive information in her employment and used that information illicitly, the defendant abused a position of trust.

The First Circuit reversed the district court in Reccko because the district court "deviated from [Application Note 1] by failing to account for whether the receptionist/switchboard operator position embodied the kind of 'professional or managerial discretion' that the Sentencing Commission has made the *signature characteristic* of a position of trust." (emphasis added).

Clyne, like the defendant in Reccko, did not have a professional or managerial position in which he exercised substantial discretionary judgment that was ordinarily given considerable deference. Rather, when Clyne was first hired he was, in essence, a "blue collar" electrician who was responsible for ensuring that the fire safety equipment on the RISD campus was working properly. As such, Clyne's position as fire safety electrician involved the application of skills and procedures; not the exercise of discretion and independent judgment. Testing, repairing and replacing fire safety equipment is not the type of work that is characterized by "professional or managerial discretion." Fire safety equipment either works or does not work. Broken equipment that cannot be repaired needs to be replaced. Professional or managerial discretion plays no role in this decision-making process.

B. Defendant's Administrative Position as Fire Safety Electrician and Manager of Fire Safety Was Not Characterized By Professional or Managerial Discretion.

Moreover, at no time was Clyne's position "characterized by professional or managerial discretion." Initially, Clyne's position was that of a hourly laborer. Over time, his position evolved into more of an administrative position involving limited administrative discretion. However, at no time was his position classified by RISD as a managerial or professional. More importantly, at no time were his responsibilities characterized by managerial or professional discretion. Indeed, at no time was he required to "manage" anything. Also, his supervision of work-study students, vendors and contractors was limited to determining whether fire safety equipment previously approved to be installed by his superiors was actually installed properly. These routine "tasks" did not raise Clyne's position to a managerial or professional level.

In addition, the fact that his supervisors allowed him to authorize payments to outside vendors did not convert his position into a professional or managerial position. At best, he had limited administrative discretion to approve invoices for payment which was subject to supervision by his superiors.

Indeed, the Probation Officer and government's argument suffers from the same infirmity as the district courts' reasoning in Reccko and United States v. Parrilla Roman, 485 F.3d 185, 191 (1st Cir. 2007), which is to conclude that a defendant holds a position of trust "precisely because [his] job provided [him] with the access needed to commit the charged crime." In Reccko, the defendant was a switchboard operator at a municipal police headquarters. In Parilla Roman, the defendant was a airline fleet service clerk with security clearance. In both cases, rather than first asking the status question (i.e., whether the switchboard operator position or airline fleet service clerk position was characterized by substantial discretionary judgment that is ordinarily given considerable deference), the district courts zeroed in on the defendant's ability

to commit the crime because, in the case of switchboard operator, she had access to confidential information and, in the case, of the airline fleet service clerk, because he had security clearance – and then used that access and opportunity as the basis for a blanket answer to both the status and conduct questions. Similarly, in this case, both the Probation Officer and the government's counsel focus on the conduct at issue and gloss over the threshold status issue.

Moreover, the government attempts to make Clyne's position into one that involved managerial discretion by alleging facts that are simply not true. For example, the government alleges in its memorandum that Clyne was the "head fire safety expert" as RISD. However, this fact is not contained in either the first or second version of the government's version of the offense. More importantly, it is not true. Indeed, the government likely added this fact to its argument to make this case more analogous to the unpublished Stone decision that it cites in its memorandum, which held that an electrician who served as a "team leader" for his employer's electricians as was recognized as a "lead electrician" abused a position of trust.

A second fact that the government alleges in its memorandum and was added to the PSR after Clyne objected to the paragraph 21 of the PSR is that Clyne was not "supervised by anyone at a higher level." Presumably, the government added this fact to make its argument that this case is like United States v. Chanthaseng, 274 F.3d 586, 589 (1st Cir. 2001), where the defendant's position as a branch operations supervisor made her the "sole decision-maker" for rapid deposit ticket approvals because she knew that her branch manager consistently failed to supervise her and allowed her to freely countersign her own rapid deposit ticket approvals in violation of Fleet bank's internal regulations. No such freedom reposed in Clyne, who was subjected to substantial supervision by his boss, the Director of Public Safety, throughout his employment at RISD.

C. Defendant Was Not Subjected To Significantly Less Supervision.

The record is also clear that defendant was not subjected to 'significantly less supervision." Rather, the records demonstrate that at all times during his employment, Clyne reported to and was supervised by the Director of Public Safety. To argue or conclude otherwise is to ignore the record in this case.

Moreover, while it is true that Clyne had the authority to request, schedule and approve work related to fire safety, his request for work had to be approved not only by his immediate supervisor, the Director of Public Safety, but at times by Fran Gast, the Associate Vice President in charge of Campus Services which oversaw both the Offices of Public Safety and Purchasing.

In addition, while Clyne was given the authority to sign off on invoices, nowhere in the PSR or in the government's memorandum is it alleged that he was the final authority on the payment of any invoice, or that the invoices were never reviewed by Clyne's supervisors, or that the invoices were not reviewed by Purchasing. Thus, unlike the lead electrician in Stone and the bank operations manager in Chanthaseng, Clyne simply did not have the type of substantial discretionary judgment that is ordinarily given considerable deference that is the signature characteristic of managerial and professional position. Moreover, he was not subjected to significantly less supervision than non-managerial or non-professional employees. On the contrary, he was subjected to a considerable amount of supervision as is clear from his performance reviews. Accordingly, he did not, in fact, hold a position of trust. Compare, United States v. Hoskins, 282 F.3d 772, 779 (9th Cir. 2002)(security guard who committed a robbery not a position of trust); United States v. Brogan, 238 F.3d 780, 786 (6th Cir. 2001)(assistant treasurer who initiated an *ultra vires* $8 million dollar transfer to an account in his name did not change his clerical position into a position of trust); United States v. Ward, 222 F.3d 909, 913 (11th Cir.

2000)(armed security guard not a position of trust); United States v. Spear, 491 F.3d 1150, 1159 (10th Cir. 2007)(immigration examination assistant not a position of trust).

Since Clyne did not occupy a position of trust, the inquiry for purposes of § 3B1.3 ends. Parrilla Roman, supra at 190. Accordingly, a two-level abuse-of-trust enhancement is not appropriate in this case.

## CONCLUSION

In conclusion, because Mr. Clyne did not hold a position of trust or use a special skill as those terms are defined in the Advisory Guidelines a two-level enhancement pursuant to U.S.S.G. § 3B1.3 is not appropriate in this case.

Respectfully submitted,

/s/ Scott P. Lopez

Scott P. Lopez, Mass. BBO # 549556
*Pro Hac Vice Counsel*
Law Office of Scott P. Lopez
24 School Street, 8th Floor
Boston, MA 02108
(617) 742-5700 (tel)
(617) 742-5715 (fax)
lopez@lopezlaw.com

/s/ Kevin J. Bristow

Kevin J. Bristow, RI Bar ID # 3984
*Local Counsel*
505 Turks Head Building
Providence, RI 02903
(401) 521-2800 (tel)
(401) 521-2812 (fax)
KJBristowlaw@verizon.net

Dated: November 21, 2007

CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2007 a copy of the foregoing Memorandum of Law was filed electronically and served by mail on any attorney of record that is unable to accept electronic filing in this. Notice of this filing will be sent by electronic mail to all parties by operation of the Court's electronic filing system or by first class mail to any attorney of record unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Scott P. Lopez
Scott P. Lopez