**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **v.** | ) | **CRIMINAL NO.: 07-CR-00107-ML** |
| **PATRICK CLYNE,** **Defendant.** | ) | |

**DEFENDANT PATRICK CLYNE'S MOTION FOR A DOWNWARD DEPARTURE AND/OR VARIANCE**

Defendant Patrick Clyne, by and through undersigned counsel, respectfully moves for a downward departure and/or variance. In support of this motion, Mr. Clyne submits his Memorandum of Law filed simultaneously herewith.

Respectfully submitted,

/s/ Scott P. Lopez
Scott P. Lopez
Mass. BBO # 549556
*Pro Hac Vice Counsel*
Law Office of Scott P. Lopez
24 School Street, 8th Floor
Boston, MA 02108
(617) 742-5700 (tel)
(617) 742-5715 (fax)
lopez@lopezlaw.com

/s/ Kevin J. Bristow
Kevin J. Bristow
RI Bar ID # 3984
*Local Counsel*
505 Turks Head Building
Providence, RI 02903
(401) 521-2800 (tel)
(401) 521-2812 (fax)
KJBristowlaw@verizon.net

Dated: November 21, 2007

CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2007, a copy of the foregoing Motion was filed electronically and served by mail on any attorney of record that is unable to accept electronic filing in this. Notice of this filing will be sent by electronic mail to all parties by operation of the Court's electronic filing system or by first class mail to any attorney of record unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Scott P. Lopez
Scott P. Lopez

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **v.** | ) | **CRIMINAL NO.: 07-CR-00107-ML** |
| **PATRICK CLYNE,** **Defendant.** | ) | |

**DEFENDANT PATRICK CLYNE'S MEMORANDUM IN SUPPORT OF HIS MOTION FOR DOWNWARD DEPARTURE AND/OR VARIANCE**

Defendant Patrick Clyne submits this sentencing memorandum and request for departure and/or variance with attached letters of support to assist the Court in fashioning a reasonable and appropriate sentence in this case. For the reasons set forth in this memorandum and based on the information and materials provided to the Court and expected arguments at the sentencing hearing, undersigned counsel respectfully suggests that a sentence of (1) home confinement, (2) community service, and (3) the required special assessments is a reasonable and just sentence under the totality of the circumstances in this case.

Post *Booker*, this Court can choose a reasonable sentence based on the factors set forth in 18 U.S.C. § 3553(a). The sentence must be "sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in paragraph 2, "namely: just punishment, adequate deterrence, protection of the public from further crimes by the defendants….." The sentence proposed herein takes into account all of the section § 3553(a) factors and accomplishes the purposes of sentencing.

I. History and Characteristics of Patrick "Berney" Clyne.

A. Mr. Clyne's Lifetime of Hard Work.

Defendant Patrick Clyne (hereinafter "Clyne") has devoted his life to helping his family and community. He was born and raised in a small rural town in Ballinamore, County Leitrim, Ireland. He came from humble beginnings, the son of a laborer and housekeeper. At the tender age of 5, he was sent to live with his grandmother to keep her company because she was all alone. Apparently, this was quite common at the time. Nevertheless, it must have been emotionally very difficult for a 5 year old boy to be separated from his mother and father. He stayed with his grandmother until he was 18 years old.

At age 13, during his Confirmation training, Clyne made a pledge not to drink alcohol until the age of 21. Apparently, the Catholic Church had some concerns about alcohol consumption and encouraged young Catholic boys to pledge abstinence. Clyne has maintained this pledge his entire life.

He was sixteen when his father died unexpectedly at the age of 40 from a perforated ulcer. According to his daughter, he had to work off the 300 pounds that it cost for his father's funeral by working after school decorating coffins and doing odd jobs for the local undertaker. At age 16 he also swore an oath to a Temperance Society that he has maintained his entire life.

Clyne's father had always dreamed of having his entire family immigrate to the United States. In February 1965, at the age of 22, Clyne immigrated to New York where he worked for Con Edison for less than a year before he was drafted into the United States Army. He subsequently applied for naturalization and became a United States citizen in the District of Rhode Island in July, 1972.

From February 1966 until February 1968 Clyne served at Fort Bragg, North Carolina with the Army Corps of Engineers, and remained on standby reserve status for another four years until January 1972. He not only received an Honorable Discharge, but also the National Defense Service Medal and a Good Conduct Medal.

After he was discharged from the service, Clyne lived with his aunt in Providence. She was a widow with only one daughter and Clyne was like a son to her. He started working for Walco Electric as an electrician where he worked for 5 years before starting his own business. After returning from the service, he also married his first wife, Jane Dunnigan, in 1968.

Clyne was married to Jane Dunnigan for 29 years. They were divorced in 1997. However, during their marriage, they raised three wonderful children. Ailis (Clyne) Costa, Clyne's oldest child, is the mother of 2 children and is a pediatrician who works in Warwick, Rhode Island. Brian Clyne, age 37, is the father of 2 children and an emergency room doctor at Rhode Island Hospital. Clyne's youngest child, Kara Lee Clyne, is unmarried but engaged to be married in May, 2008. She is also involved in health care and is employed in a nursing home in Connecticut.

The letters written by Clyne's two oldest children, Ailis and Brian, reveal childhood memories of a young and happy man and couple who were very involved at St. Paul's Church with a wide social circle of friends, including many other Irish immigrants. Ailis writes: "There was music, bands in the living room, plays at the Irish Drama Society and they were very happy. There were camping trips and ball games. They were supportive and encouraging and in this setting my brother and I thrived academically." When Clyne purchased the family's home on Ferncrest Avenue, in Cranston, Brian wrote: "I was only about 4 years old, but feelings of hope and that of a close-knit family created a warm and lasting impression on me. I can't help but

think that my father was living the dream of an Irish immigrant to America – he had valuable skills as an electrician, a healthy young family, and a new status as homeowner."

However, both Ailis and Brian recall their father working long hours running his own business and determined to provide for his family. Financial struggles came in the '80s and Ailis noticed that her father started to withdraw from social situations. More and more he preferred to be by himself and drifted away from his friends and his wife. At the same time, religion became more important in his life as he struggled financially.

In the mid-1990s, Clyne was diagnosed with diabetes and his wife, Jane, was diagnosed with breast cancer. Ailis observes in her letter that although her parents began to drift apart before they became ill, it was hard for them as individuals and as a couple to cope with illness and the reality of aging. In 1997, Clyne's marriage came to an end. In January 1999, Clyne filed for personal bankruptcy. It was during this time of personal and financial failure that Clyne began his employment at the Rhode Island School of Design.

From July 1997 until November 2005, Clyne worked employed as an electrician with the Rhode Island School of Design. Before July 1997, Clyne worked as a self-employed electrician for 26 years. Before that he worked as an electrician for five years with Walco Electric. Thus, after being drafted into the military and serving his country with honor, Clyne has had a remarkable history of uninterrupted employment for a period of 39 years.

B. Mr. Clyne's Frail Health.

Stated simply, it is quite possible that a lengthy sentence of imprisonment could kill Mr. Clyne. Mr. Clyne's health problems are complicated and serious. More importantly, Clyne's health has been declining since 2004. Of major concern is Clyne's history of cardiac disease which nearly caused his death in 2004, and which under the stress of this case, caused another

hospitalization this past summer. Additionally, Clyne is currently prescribed a number of medications that are deemed Non-formulary medications by the Federal Bureau of Prisons. These non-formulary medications will not be administered unless the Bureau of Prisons determines that certain clinical criteria is established. Clyne's long acting insulin, Lantus, falls into this category. The Lipitor Clyne is taking also falls into this category. More importantly, rapid acting insulin that Clyne takes with each meal, Novolog, is a medication that the Bureau of Prisons' National Formulary provides is "too short acting to be used safely in most correctional environments" and "[w]ill be used at Medical Centers only."

A review of Clyne's medical records indicate that he suffers from a number of serious health issues including:

1) Coronary Artery Disease (CAD) post myocardial infarction with multiple stent placements;

2) Insulin dependent diabetes which is unstable and requires both long acting Insulin and frequent doses of short acting Insulin as supplement to the dosage being determined by blood sugar levels at mealtime;

2) Congestive Heart Failure (CHF);

3) Adult chronic immune thrombocytopenic purpura (Chronic ITP);[1]

4) Dyspnea (difficulty breathing/ shortness of breath);

5) Asthma;

6) Chronic lung disease (COPD); [2]

---

[1] Chronic ITP is an autoimmune disorder in which patients produce antiplatelet autoantibodies and specialized white blood cells that destroy their blood platelets and, in some cases, damage their megakaryocytes (the cells that produce platelets in the bone marrow), causing a decrease in platelet production.

7) Hyperlipidemia (high cholesterol); and

8) Gastroesophageal Reflux.

In addition, Clyne had a heart attack or Acute Myocardial Infarction (MI) in May 2004, and afterwards had a catheterization, a percutaneous transluminal coronary angioplasty (PTCA) and stent placement in his right coronary artery (RCA) and left anterior descending (LAD). In August 2005, he had a repeat catheterization. In August, 2007, he had a third catherization which revealed a 50% instent restenosis in the left anterior descending coronary artery (LAD)**,** a totally obstructed distal left anterior descending coronary artery, 40% instent restenosis of the diagonal, and a patent right coronary artery (RCA). Finally, he was found to have a 60%-75% blockage of the right internal carotid artery as well as blockage of the right internal carotid artery.

A carotid ultrasound performed in August, 2007 further revealed that he has a 60% to 79% blockage of the right internal carotid artery. There is also a 50% blockage in his right subclavian. Since October, 2006, he has also been experiencing intermittent blackouts.

The medications he is currently prescribed include:

| ***Medication*** | ***Amount*** | ***Times per day*** |
|---|---|---|
| Novolog (rapid acting insulin) | 10 units | 4 times |
| Lantus (long acting insulin) | 70 units | 1 |
| Lipitor | 20 mg | 1 |
| Aspirin | 80 mg | 2 |
| Omeprazole | 20 mg | 2 |
| Nitroquick | .4 mg | As needed |
| Seretide 500 inhaler | 1 puff | 2 |
| Advair 500 inhaler | 1 puff | 2 |

[2] Chronic lung disease is the term for a wide variety of persistent lung disorders. Emphysema and chronic bronchitis (referred to as Chronic Obstructive Pulmonary Disease or COPD), asthma, cystic fibrosis, and restrictive lung diseases are examples of chronic lung disease.

He currently requires access to this short and long-acting insulin, glucometer, test strips and carbohydrate snacks to keep his unstable sugar levels under control.

As noted above, both insulins Clyne is currently prescribed are Non-formulary medications which will require trial and error attempts at substitutions by the Bureau of Prisons, which could jeopardize Clyne's life. Indeed, except for the aspirin he takes twice a day and the nitroglycerin he takes as needed, none of his current medications are considered Formulary medications including: Lipitor; Omeprazole; Seretide 500 inhaler; and Advair 500 inhaler. Thus, none of Clyne's current medications appear to be authorized by the National Formulary. See Federal Bureau of Prisons Health Services National Formulary 2007 http://www.bop.gov/news/PDFs/formulary.pdf at pgs. 17, 26, 27, 64, The fact that so many of Clyne's current medications are not part of the Bureau of Prisons Formulary is of grave concern to Clyne and his family particularly in light of his unstable diabetes. See Clyne's Motion to Seal Medical Records filed separately to protect protected health care information.

II. The Nature of the Offense.

Mr. Clyne's Acceptance of Responsibility Letters is appended to his Presentence Report in which he expresses his deep sorrow and remorse for his conduct in this case. However, what is striking about the nature of this offense is that it is so out of character for Clyne. As the letters submitted and attached hereto attest, Clyne is genuinely loved by his family and friends. He could not have attained this level of respect if he was fundamentally a dishonest person. In this respect, the offense conduct is out of character for Clyne.

III. Sentencing Guidelines Considerations.

The application of the Sentencing Guidelines to Clyne is set forth in the Presentence Report. Clyne has disputed the Probation Officer's request for an abuse-of-trust or special skill enhancement in a separate memorandum. Clyne has disputed the government's request for a 2-level enhancement for obstruction of justice in a separate memorandum. Pursuant to the plea agreement in this case, the Government has agreed to recommend that the Court impose the lowest term of imprisonment determined by the Court under the Advisory Guidelines, but not including probation or a "split-sentence", even if permitted by the Guidelines. The government has further agreed to recommend a decrease for acceptance of responsibility, including the additional one level because the offense level is greater than 16. Nevertheless, Clyne is requesting a departure or variance to Offense Level 10 so he will be eligible to serve a sentence of home confinement.

IV. Grounds for Departure and/or Variance.

18 U.S.C. § 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes set forth in § 3553(a)(2). Moreover, 18 U.S.C. § 3582 further instructs the Court to "consider the factors set forth in section 3553(a) to the extent they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.*" (Emphasis added).

In determining the proper sentence in this case, it is important to note that "the starting point for every sentence should be probation or some other sentence not involving commitment or confinement." *American Bar Association Project on Minimum Standards for Criminal Justice, Sentencing Alternatives and Procedures*, (Approved Draft, 1968), Section 2.3(e), pp. 72-

73. However, under the Advisory Guidelines, Clyne is not eligible for probation without a downward departure, *see* U.S.S.G. § 5B1.1., or a variance.

In this case there are a number of factors which alone or in combination warrant the conclusion that the Advisory Guideline range is greater than necessary.

A. Mr. Clyne's Poor Health.

U.S.S.G. §5H1.4. provides, in pertinent part:

> Physical condition or appearance, including physique, is not ordinarily relevant in determining whether a departure may be warranted. However, an extraordinary physical impairment may be a reason to depart downward; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

Notwithstanding the Federal Bureau of Prisons (hereinafter "BOP") institutional position that it can adequately treat anyone and that it currently has prisoners who have Clyne's health problems, Clyne submits that his medical issues in combination demonstrate an extraordinary physical impairment warranting a departure in this case. United States v. Woodward, 277 F.3d 87, 92-93 (1st Cir. 2002)(recognizing the authority of district courts to depart in the case of extraordinary physical impairment). In this Circuit, the Court may find an extraordinary impairment when imprisonment would threaten or shorten a defendant's life or when the Bureau of Prisons would be unable to adequately meet a defendant's medical needs. United States v. Martin, 363 F.3d 25, 49 (1st Cir. 2004); United States v. Diaz, 433 F.3d 128, 140 (1st Cir. 2005).

In the present case, Clyne's frail health makes him extremely vulnerable to the risk of death if his coronary artery disease or diabetes is not treated properly. Moreover, as noted above, many of Clyne's current medications are not part of the BOP's National Formulary. In addition, Clyne's short-acting insulin has been deemed by the BOP to be too short acting to be used safely in most correctional environments. Accordingly, there is adequate support in this

record for the Court to conclude that BOP will be unable to adequately meet Clyne's medical needs. See United States v. Martin, supra at 49 (departure affirmed where record indicated that the Bureau of Prisons would not administer Demerol to defendant during his incarceration, putting him at risk for a severe episode). Obviously, if Clyne's diabetes is not properly regulated, he will be at risk for both acute complications and chronic complications.

One of the acute complications for patients with type 2 diabetes is a hyperosmolar coma. Accompanied by dehydration, severe blood sugar elevation in patients with type 2 diabetes can lead to an increase in blood osmolality (hyperosmolar state). This condition can lead to a coma (hyperosmolar coma). A hyperosmolar coma usually occurs in elderly patients with type 2 diabetes. A hyperosmolar coma is a medical emergency. Immediate treatment with intravenous fluid and insulin is important in reversing the hyperosmolar state. Unlike patients with type 1 diabetes, patients with type 2 diabetes do not generally develop ketoacidosis solely on the basis of their diabetes. Since in general, type 2 diabetes occurs in an older population, concomitant medical conditions are more likely to exist, and these patients may actually be sicker overall.

A second acute complication of diabetes is hypoglycemia or abnormally low blood sugar (glucose). The most common cause of low blood sugar is excessive use of insulin, or other glucose-lowering medications, to lower the blood sugar level in diabetic patients in the presence of a delayed or absent meal, which could occur, for example, during a lockdown. When low blood sugar levels occur because of too much insulin, it is called an insulin reaction. Sometimes, low blood sugar can be the result of an insufficient caloric intake or sudden excessive physical exertion.

Blood glucose is essential for the proper functioning of brain cells. Low blood sugar can lead to central nervous system symptoms such as dizziness, confusion, weakness, and tremors.

The actual level of blood sugar at which these symptoms occur varies with each person. Untreated, severely low blood sugar levels can lead to coma, seizures, and, in the worse case scenario, irreversible brain death.

Chronic complications of diabetes are related to blood vessel diseases and are generally classified into small vessel disease, such as those involving the eyes, kidneys and nerves (microvascular disease) and large vessel disease involving the heart and blood vessels (macrovascular disease). Diabetes accelerates hardening of the arteries (atherosclerosis) of the larger blood vessels, leading to coronary heart disease (angina or heart attack), strokes, and pain in the lower extremities because of lack of blood supply. The major eye complication of diabetes is called diabetic retinopathy. Diabetic retinopathy occurs in patients, like Clyne, who have had diabetes for at least five years. Diseased small blood vessels in the back of the eye cause the leakage of protein and blood in the retina. Disease in these blood vessels also causes the formation of small aneurysms (microaneurysms), and new but brittle blood vessels (neovascularization). Spontaneous bleeding from the new and brittle blood vessels can lead to retinal scarring and retinal detachment, thus impairing vision. Poor control of blood sugar and blood pressure further aggravates eye disease in diabetes.

Kidney damage from diabetes is called diabetic nephropathy. The onset of kidney disease and its progression is extremely variable. Initially, diseased small blood vessels in the kidneys cause the leakage of protein in the urine. Later on, the kidneys lose their ability to cleanse and filter blood. The accumulation of toxic waste products in the blood leads to the need for dialysis. Dialysis involves using a machine that serves the function of the kidney by filtering and cleaning the blood. In patients who do not want to undergo chronic dialysis, kidney transplantation can be considered.

The progression of nephropathy in patients can be significantly slowed by controlling high blood pressure, and by aggressively treating high blood sugar levels. Angiotensin converting enzyme inhibitors (ACE inhibitors) or angiotensin receptor blockers (ARBs) used in treating high blood pressure may also benefit kidney disease in diabetic patients.

Nerve damage in diabetes is called diabetic neuropathy and is also caused by disease of small blood vessels. In essence, the blood flow to the nerves is limited, leaving the nerves without blood flow, and they get damaged or die as a result (a term known as ischemia). Symptoms of diabetic nerve damage include numbness, burning, and aching of the feet and lower extremities. When the nerve disease causes a complete loss of sensation in the feet, patients may not be aware of injuries to the feet, and fail to properly protect them. Shoes or other protection should be worn as much as possible. Seemingly minor skin injuries should be attended to promptly to avoid serious infections. Because of poor blood circulation, diabetic foot injuries may not heal. Sometimes, minor foot injuries can lead to serious infection, ulcers, and even gangrene, necessitating surgical amputation of toes, feet, and other infected parts. See Medline Article on Diabetes Mellitus at http://www.medicinenet.com/diabetes_mellitus/article.htm#tocb.

A review of Clyne's medical records demonstrate that he is already experiencing some of the chronic complications of diabetes. Moreover, almost every medication that Clyne is currently prescribed is not part of the BOP National Formulary. Also, it is clear that the BOP cannot eliminate the stress that is experienced by prisoners as a result of the conditions and practices of incarceration. Indeed, it is well settled that first-time offenders of advanced age like Clyne are likely to have problems adjusting to prison since they are new to the environment, which will cause underlying stress and probable stress-related health problems. Furthermore, they are "easy prey" for more experienced predatory inmates. See Correctional Health Care,

Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates, U.S. Department of Justice, National Institutes of Corrections, p. 10 (2004 ed.), available at http://www.nicic.org/Library/018735.

The people who know Clyne the best, his family, have all expressed their concerns about his health and particularly the management of his diabetes. At present, Clyne regularly monitors his blood sugars at each meal and supplements his long-acting insulin with short-acting insulin. However, if he is incarcerated it is likely he will not be able to self-regulate his diabetes because Novolog "generally speaking is too short acting to be used safely in most correctional environments." Moreover, Novolog can only be used at Medical Centers, but not necessarily. See National Formulary, supra at p. 27.

Clyne's primary care physician, Dr. Dudley Bennett, in a letter sent to undersigned counsel dated November 12, 2007, indicates that Mr. Clyne has insulin dependent diabetes which is quite labile (unstable) requiring both long acting Insulin and frequent doses of short acting Insulin as supplement to the dosage being determined by blood sugar levels. Thus, only if Clyne is designated to a Medical Facility and is permitted to continue the use of short-acting Insulin, will he be able to continue on his present course of managing his diabetes. Dr. Bennett's letter is in the Clyne's extensive medical records.

Unfortunately, this Court does not have the authority to order the Bureau of Prisons to designate Clyne to a medical facility or to order the Bureau of Prisons to administer short-acting insulin. See National Formulary, supra, at p. 4. Rather, the National Formulary provides:

> It is expected that court orders from judges are seen as recommendations only, as judges cannot order specific treatments. Case law does not exist which would authorize specific treatments from judges. Such cases should be referred to the appropriate attorneys. All such recommendations are still subject to the non-formulary approval process. Id.

Moreover, the process for designating Clyne to a medical facility contained in the Federal Bureau of Prisons Program Statement on Medical Designations and Referral Services for Federal Prisoners, Number P6270.01 only permits this Court to make a recommendation that may or may not be followed.[3] See http://www.bop.gov/DataSource/execute/dsPolicyLoc. Thus, even if the Court makes a recommendation that Clyne should serve his sentence in a CARE Level Facilities, or Medical Referral Center, like the one at FMC Devens, there is no guarantee that Clyne will be designated to that facility or a similar facility.

In summary, Clyne submits that a finding of extraordinary physical impairment is amply supported in this record and, accordingly, a departure or variance is warranted.

B. Mr. Clyne's Age and First Offender Status.

U.S.S.G. § 5H1.1 states: "Age (including youth) is not ordinarily relevant in determining whether a departure or variance is warranted. Age may be a reason to depart downward in a case in which the defendant is elderly and infirm or where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration…." Elderly offenders, whether or not seriously infirm, suffer greater punishment in prison because they are at risk of being preyed upon by younger inmates and lack social support. See Correctional Health Care, Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates, U.S. Department of Justice, National Institutes of Corrections, p. 9 (2004 ed.), available at http://www.nicic.org/Library/018735.

[3] PS P6270.01 provides that the following information must be considered before making an initial medical designation:

1) The inmate's medical needs;
2) The inmate's security needs;
3) Proximity to the inmate's home;
4) Transportation requirements; and
5) Recommendations made by the sentencing judge.

Moreover, it is well established that the risk of recidivism drops dramatically in defendants who are forty and older, which lessens the need to protect the public from further crimes of the defendant pursuant to 18 U.S.C. § 3553(a)(2)(C). See United States Sentencing Commission, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines at 12 ("Recidivism rates decline relatively consistently as age increases," from 35.5 % under age 21, to 9.5% over age 50) available at http://www.ussc.gov/publicat/Recidivism_General.pdf. In addition, for first-time offenders over the age of 50, the recidivism rate is even lower at 6.2%. Id. at p. 28; see also, United States v. Thomas, No. 03- CR-30033-MAP, slip op. at *11 (D.Mass. March 14, 2005); Simon v. United States, No. CR-90-216, slip op. at *28 (E.D.N.Y. March 17, 2005).

Thus, Clyne's first offender status makes his rate of recidivism very low. Moreover, other factors such as his advanced age at the time of sentencing (65), educational attainment (electrician with a few college courses), his sustained employment during the year prior to his sentencing, his marital status and stable family circumstances all suggest that Clyne's risk of recidivism is almost non-existent.

The "first offender" philosophy in sentencing policy generally encourages lower sentences for offenders who have little or no prior criminal record. This philosophy, which can be derived directly from the Guidelines Chapter Four introductory commentary, postulates that first offenders are less culpable and less likely to re-offend. As such, they are deserving of reduced punishment.

In 26 U.S.C. § 994(j) Congress directed the Sentencing Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence

or an otherwise serious offense…." Under the guideline applicable in this case, the Sentencing Commission has not done so. Indeed, there is no indication in the amendments to the fraud or tax guidelines that have only increased punishment have been justified by any data or information considered by the Commission. Thus, the Commission did not do what they were mandated by Congress to do when 26 U.S.C. § 994(j) was enacted. The guidelines do not "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender." They have simply increased the penalties to insure that more first time offenders are incarcerated.

Clyne also notes that U.S.S.G. § 5C1.1 is no longer mandatory. Rather, only statutory provisions that limit what kinds of sentences may be imposed, such as mandatory minimums, are mandatory. See 18 U.S.C. § 3551 (authorized sentences). Indeed, in this case Clyne is entitled to a sentence of probation. See 18 U.S.C. § 3561 (a)-(b) (authorizing a sentence of probation for not less than one nor more than 5 years). Moreover, the Court may impose a sentence with the characteristics of a different zone than the zone in which the guideline sentence falls. See United States v. Anderson, No. 04-85-P-H (D. Me. April 20, 2005)(imposing guideline sentence of 18 months but using a Zone C split sentence (9 in prison and 9 home confinement) because of rehabilitation and family circumstances); but see United States v. Tom, 504 F.3d 89 (1st Cir. 2007)(the sentence must be reasonable).

C. Mr. Clyne's Exceptional Employment History.

Finally, Clyne's exceptional employment history, while ordinarily a discouraged factor, see U.S.S.G § 5H1.5, is yet another basis for this Court to depart or vary downward. See United States v. Higgins, 967 F.2d 841 (3rd Cir. 1992)(stable employment, if extraordinary will justify departure); United States v. Alba, 933 F.2d 1117 (2d Cir. 1991)(long-standing employment at

two jobs). In the present case, Clyne's 39-year uninterrupted employment record warrants a departure.

Finally, the Court may depart from the applicable Guideline range based on a combination of two or more offender characteristics or other circumstances, none of which independently is sufficient to provide a basis for departure, if (1) such offender characteristics or other circumstances, taken together, make the case an exceptional one; and (2) each such offender characteristic or other circumstance is (A) present to a substantial degree; and (B) identified in the guidelines as a permissible ground for departure, even if such offender characteristic or other circumstance is not ordinarily relevant to a determination of whether a departure is warranted. U.S.S.G. § 5K2.0. In the present case, Clyne submits that his frail health, advanced age and first offender status taken together makes this case an exceptional one that warrants a departure or a variance to the extent necessary to impose a sentence of home confinement and community service.

V. <u>The Purposes of Sentencing</u>

Section 3553(a) provides that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."

Paragraph (2) in turn directs the court to consider the need for the sentence imposed –

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In this case, a sentence of home confinement and community service is sufficient to achieve the purposes of sentencing set forth in § 3553(a)(2).

A. Seriousness of the Offense, Promoting Respect for the Law and Just Punishment

A sentence of home confinement and community service is not an easy sentence. It is restrictive and punitive. Clyne will be reminded every day that his freedom is restricted that he is being punished.

Moreover, Clyne's punishment began when he was terminated from RISD. Also, Clyne has been punished by the humiliation and embarrassment arising out of the substantial publicity that has occurred both here and in Ireland. Most importantly, Clyne has been punished by losing what is most precious to him other than his family – his reputation. A sentence of home confinement and community service will be sufficient to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

B. Adequate Deterrence

Incarceration of Clyne is unnecessary to deter him. Incarceration of Clyne is unnecessary to deter others. The public will understand that a sentence of home confinement and community service is sufficiently punitive for a 65-year man with serious medical issues who is also a first offender and in a stable marriage, who has otherwise led an exemplary life.

C. Protection of the Public

Without repeating what is stated above, the chances of Clyne recidivating is non-existent for many reasons. In addition to the many factors present here that indicate that the risk of recidivism is very very low, perhaps the most glaring reason to believe that Clyne will never commit a crime like this in the future is because he is over 65 and physically incapable of full-time employment. A sentence of home confinement and community service will protect the public because Clyne will not reoffend.

D. Providing the Most Effective Medical Care

Section 3553(a)(2)(D) requires the Court to fashion a sentence that will provide necessary medical care to the defendant "in the most effective manner." Allowing Clyne to receive medical care while in home confinement will allow continuity in his treatment by physicians who are familiar with his myriad of health problems. It will avoid dangerous experimentation with his drug regimen. It will increase his chances of survival by preventing the stress to which he will be exposed by imprisonment. It will also spare the government the expense of his medical care, which could be enormous if he suffers another heart attack or other serious event. See U.S.S.G. § 5H1.4 (policy statement noting that it is appropriate for court to consider whether home detention is less costly than imprisonment in the case of a seriously infirm defendant).

## CONCLUSION

In summary, Clyne submits that the above factors viewed alone or in combination makes this case an exceptional one that warrants a departure or a variance to the extent necessary to impose a sentence of (1) home confinement, (2) community service, and (3) the required special assessment.

. WHEREFORE, Mr. Clyne respectfully requests the Court to grant a departure or variance down to Level 10 to allow a sentence of probation with home confinement and community service and any additional conditions the Court deems necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

/s/ Scott P. Lopez
Scott P. Lopez
Mass. BBO # 549556
*Pro Hac Vice Counsel*
Law Office of Scott P. Lopez
24 School Street, 8th Floor
Boston, MA 02108
(617) 742-5700 (tel)
(617) 742-5715 (fax)
lopez@lopezlaw.com

/s/ Kevin J. Bristow
Kevin J. Bristow
RI Bar ID # 3984
*Local Counsel*
505 Turks Head Building
Providence, RI 02903
(401) 521-2800 (tel)
(401) 521-2812 (fax)
KJBristowlaw@verizon.net

Dated: November 21, 2007

CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2007, a copy of the foregoing Motion was filed electronically and served by mail on any attorney of record that is unable to accept electronic filing in this. Notice of this filing will be sent by electronic mail to all parties by operation of the Court's electronic filing system or by first class mail to any attorney of record unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Scott P. Lopez
Scott P. Lopez

The Honorable Mary M. Lisi,
Chief Judge
United States District Court
District of Rhode Island
One Exchange Terrace
Federal Building and Courthouse
Providence, RI 02903

Re: *United States vs. Patrick Clyne*
US District Court, Criminal No.: 07-CR-00032-ML

Dear Chief Judge Lisi:

My name is Ailis Clyne and I am the oldest child of Patrick B. (Berney) Clyne. I grew up with my family in Cranston. Rhode Island and I have been a pediatrician practicing in Warwick for the past nine years. I live in North Kingstown. In this letter, I want to give you my insights and observations regarding my father. These reflections come from different perspectives: my thoughts as a child. as an adult. as a physician. and a parent with children of my own.

It is very difficult for a child to watch her parent struggle. Whether it is physical decline, the crumbling of a marriage, the controversy of a tainted career. or the stress of financial ruin. you can't hide your sadness. I've had to watch my father struggle in all of these ways over the past decade and it has been very painful. I wonder how this happens. How does a person with so much intelligence. motivation. with wide ranging interests and aspirations end up facing the prospect of a prison sentence? Over and over to myself I mutter the same thought; *this just doesn't make sense to me.*

I flip through the picture album of his life in my mind. First, there is the tattered black and white photo of him at age five. a little boy and his dog in Ireland wearing shorts in the freezing cold of winter with a broad smile on his face. He had just gone to live with "Mother". his grandmother, the matriarch of a family of thirteen children. She was all alone and Berney was sent to live with her to keep her company. He says this sort of thing was done all the time. but still it had to be strange for a child to leave his parents. He kept Mother company and took care of her until he was eighteen. His own family lived close by in the same rural small town. He was sixteen when his father died suddenly. He had to work off the 300 pounds that it cost for his funeral by working after school decorating coffins and doing odd jobs for the undertaker. He went to the technical college in his town and put his skills to work traveling around Ireland with the Electric Supply Board's rural electrification program. He sent some of his money home.

His father's dream had been to have his entire family immigrate to America. When Berney was twenty-three he followed in his sister's footsteps and moved to New York where he worked for Con Edison for less than a year before being drafted. He spent two years in the service stationed at Fort Bragg working with the Army Corps of Engineers. While others were out partying after a days work. my father worked odd jobs at the cinema and bowling alley for extra pay. He had sworn an oath to the Temperance Society at age sixteen to never drink alcohol and he proudly wore that pin on his best suit jackets for as long as I can remember. He sent money from his army paychecks home.

After the service, he came to live with his aunt in Providence. She was a widow with only one daughter. Berney was like a son to her and she was like a grandmother to us. He went to work for Walco power as an electrician where he worked for five years before venturing out on his own as a self-employed electrician. By then he had married and had two children and had saved up enough to move from an apartment in Providence to a house in Cranston. This is where my childhood memories begin.

My parents were young and happy and social then. They were always very involved at St. Paul's church. They had a wide social circle including many other Irish immigrants. There was music, bands in the living room, plays at the Irish Drama Society and they were very happy. There were camping trips and ball games. They were supportive and encouraging and in this setting my brother and I thrived academically.

My father worked hard and I think that being a small business owner was difficult. Financial struggles came in the '80's and I saw in him frustration and a gradual withdrawal from social situations. More and more he preferred to be by himself and drifted away from friends. The most dramatic change I saw came after my brother and I left for college. I think we had given that house energy and had been the source of excitement. There were track meets, school plays, and football, baseball, and hockey games. This gave a rhythm to their lives and left a void for my younger sister and parents when we were gone. I sensed a different atmosphere in that house when I went back to visit, a dullness and depression that was sad to see.

At the same time, I also saw religion come to the forefront in their lives. Both of my parents had always been religious, but it seemed that embracing Jesus softened the disappointment of not being financially successful. There was often talk about the insignificance of material things. When my father dropped me off at college, as he was saying good bye, he handed me a bottle of holy water from Knock and told me to keep an open mind to a calling from God. I didn't know how to take this. Maybe he had thought of the clergy as the road he had not taken.

He looked more and more tired to me when I would come home to visit in the college and medical school years. I think the physical nature of his work was beginning to take its toll. He was diagnosed with diabetes and my mother with breast cancer in the mid '90's. I think they had begun to drift apart before this point and it was hard for them as individuals and as a couple to cope with illness and the reality of aging.

I was thrilled when he got the job with RISD. I had always been worried about the unpredictable nature of self employment and he was just not able to keep up with a physical job anymore. Now he had a reliable paycheck, benefits, less physically demanding work. I was relieved.

But, then atypical things began to happen. One night I came home to find my parents having dinner with friends: Ibtisama and Tom Bradley. Everyone was lively and it was the most animated I had seen my father in years. It was nice to see them all so upbeat. There was a flirtatious quality about Sama that was obvious. I was not surprised later when my father left my mother for Sama. I was, however, surprised by the abrupt manner in which he left without a conversation or a fight.

In the end, I think that children want the same things for their parents that parents want for their children. I wanted him to be happy and healthy and safe and I slowly realized that he was happier with Sama then he had been in his life in a very long time.

I don't understand what happened at RISD. I have not been privy to all of the details. When I look at the allegations in the context of his life, I am again left thinking: *this does not make sense for this man.* Here is a person whose entire upbringing was against the backdrop of the rules oriented Catholic faith, a faith that he embraced and honored. Duty and responsibility defined his actions from a very early age. He was not a gambler, a schemer, defiant or rebellious. Why he would veer from his ways at such a point in his life?

As a daughter, my most immediate concern for my father is his health and safety. His health has deteriorated significantly in the past few years with insulin dependent diabetes, heart attacks, and lung disease. He had a heart attack in May of 2004 and had four stents placed in his coronary arteries. One year later in the spring of 2005, he had pneumonia for which he did not seek treatment and subsequently developed scarring and chronic shortness of breath. He had to have another coronary artery stent placed in August 2005. When his weight plummeted in the spring of 2006, I assumed he had cancer. Fortunately this was not the case, but it heralded a gradual worsening of his diabetes.

It came to the point where oral medication was no longer effective and insulin injections were begun in January 2007. I feel he now has a good understanding of his diabetes. He is diligent about checking his blood sugar at meal times and logging results into a computer program. Despite this close attention, the amount of insulin necessary to control his blood sugar has doubled; this is an indication of worsening insulin resistance. He also often has episodes of hypoglycemia where his blood sugar becomes low in the middle of the night which wakes him from sleep. He has to get up and eat a carbohydrate snack when this happens.

This suboptimal control of his blood sugar puts him at high risk for further cardiovascular problems. In the fall of 2006, he began having frequent episodes of losing consciousness which still have not been clearly explained. He does have narrowing of some of the blood vessels in his neck but his cardiologists feel they are not yet at a critical point to warrant intervention. He was hospitalized in July 2007 with shoulder pain and testing showed evidence of a recent heart attack. He had developed two additional areas of narrowing in the coronary arteries, but with low platelets, it was felt to be too risky to place new stents. The low platelets also made it necessary to discontinue the medication Plavix which is supposed to be taken to decrease the risk of the stents clotting off.

My biggest fear is that he will not have access to the medical care he needs especially in the setting of another heart attack or hypoglycemic episodes in the middle of the night. I hope that you can recommend placing him in an environment where he can continue to monitor and manage his blood sugar optimally and have access to his diabetes supplies: insulin, glucometer, test strips and carbohydrate snacks. Finally, I ask, as you consider his sentence, to take into account his personal history of hard work and support of his family as well as his current medical needs.

Respectfully,

Ailis Clyne

Ailis Clyne

The Honorable Mary M. Lisi,
Chief Judge
United States District Court
District of Rhode Island
One Exchange Terrace
Federal Building and Courthouse
Providence, RI 02903

Re: United States vs. Patrick Clyne
US District Court, Criminal No.: 07-CR-00032-ML

Dear Chief Judge Lisi:

I write this letter of support for my father, Patrick Clyne, in advance of his sentencing hearing later this month. While I do not know any detailed facts of the case, I am aware of the potential consequences he faces for his role in it. The purpose of this letter is to share with you some personal characteristics that define Patrick Clyne as a person and a father, rather than as a defendant.

One of my earliest childhood memories is the day we moved into our house on Ferncrest Avenue in Cranston. I was only about 4 years old, but feelings of hope and that of a close-knit family created a warm and lasting impression on me. I can't help but think that my father was living the dream of an Irish immigrant to America-he had valuable skills as an electrician, a healthy young family, and new status as a homeowner. Throughout childhood I remember my father working long into the evening running his own business, determined to provide for his growing family. In many ways, the hard work paid off and dreams were realized. He always emphasized the importance of education and helped raise three successful children who appreciate the values of education and hard work. He encouraged his children to be independent and make their own decisions. As a teenager working for my father's business, I came to know him as a patient and considerate man who devoted many hours teaching me his trade. In high school and college, he was a fixture at my athletic events providing words of encouragement regardless of my performance. He has always been a good listener.

Along the way, I've come to recognize that my father is a complex person with shortcomings and vulnerabilities. He is not always a good communicator and he guards his emotions fiercely. He does not trust others easily and he has made some poor decisions. Despite these flaws, I know him to be a kind, thoughtful, and proud man who influenced my life in a positive way.

I am deeply saddened by my father's involvement with any wrongdoing against RISD. Criminal behavior is not consistent with his personality or background. I don't know the factors you consider in the sentencing process, but I hope this information sheds some light on my father as a person.

Respectfully,

Brian Clyne

The Honorable Mary M. Lisi,
Chief Judge
United States
District of Rhode Island
One Exchange Terrace
Federal Building and Courthouse
Providence RI 02903

Re: *United States vs. Patrick Clyne*

US District Court, Criminal No.: 07-CR-00032-ML

Dear Chief Judge Lisi:

My husband Berney brought a state of peace and contentment into my life I never thought existed or could ever be experienced. Our ten years together marred by the recent events will not change or diminish my Love for Berney, for he will always remain my guiding light and strength.

Berney in his quiet way won the hearts of my children, my parents, sister and brothers, and all that came in contact with him.
My friendship was transformed into love watching him giving to all, putting them before himself and expecting nothing. His generosity not only crossed oceans to help family and friends alike but also closer to home, to all that needed help, moral support, advice or just a simple ear to listen.

I am still learning, his motto the 3 C's – do not criticize condemn or complain, to accept the unacceptable and to have the patience to live through any adversity. Needless to say I am far from getting close to understanding how I can practice all this knowledge, my only hope that he will always be there to guide me.

He embraced my Children and my grandchildren as his own, a wonderful father and grandfather to his own children and grandchildren. When Lisa was getting married she asked Berney to walk her down the aisle, he told her he would be proud to do so, but he encouraged and guided her to forgive and reunite with her father which she did.
Her wedding was most memorable, not because Lisa was the most beautiful bride but that we all were united lovingly to celebrate together, forgiving and forgetting a distant past.

Berney's health has deteriorated these last few years and yet no complaint, though I spend sleepless nights worried. It is hard to see him in pain trying to make every day happy for all around, never doubting that all will turn out well in the end.

His health remains my biggest concern. My brother who is a heart surgeon after reviewing Berney's records, told me because of the complication of the diabetes he will eventually need open heart surgery. Yet controlling his diabetes has been a challenge.

Regardless of all, I am and never have been more proud, honored or blessed to have him in my life hopefully for many years to come. In the words of my mother "He is your guardian angel."

X

Ibtisama Clyne

The Honorable Mary M. Lisi,
Chief Judge
United States
District of Rhode Island
One Exchange Terrace
Federal Building and Courthouse
Providence RI 02903

Re: *United States vs. Patrick Clyne*
US District Court, Criminal No.: 07-CR-00032-ML

Dear Chief Judge Lisi:

My name is Lisa Lefringhouse and I am the youngest child of Ibtisama Bradley, who is the wife of Berney Clyne. I have known Berney for more than ten years, and in that time I can truly say he is the most giving, hardworking, compassionate and loving man I have every met. He would stop and help a total stranger if they needed it and I have witnessed him do so. Throughout the time I have known him, he has put the well being of others at the forefront to his own. In all things, he puts himself second to others. He gives so much and never asks for anything in return. I know he would sacrifice his life for any of his friends and family and we the same for him.

Berney was a friend and father figure to me after my parents' divorce. I knew I could turn to him for anything. Even though he knew how much anger I had towards my father, and even though he was going through his own divorce and family difficulties, he opened his heart to me and embraced me as a daughter. He guided me through some of the most difficult years of my life. He guided me with friendship, fatherly love and patience. He taught me about unflinching kindness, spirituality and above all forgiveness. He and my mother took me in when I could not afford to pay for my own place. He has been more of a father to me these last 10 years than my own father has.

Even though my father and I were estranged, he constantly spoke of forgiveness. He opened my eyes and helped me dig deep into my soul to learn that it is much easier to be angry than to forgive. If it was not for Berney, I probably would not have mended those wounds, learned to forgive and renewed my relationship with my father. He helped me grow as a human being. He has so much compassion and love and is a gift to humanity.

In these last few years Berney has been there to guide me through the difficulties that come with being a military fiancée and now spouse. My husband, a Major in the United States Marine Corp, was deployed for a year to Iraq and it was an extremely difficult year. He helped me constantly reaffirm that my husband and I are soul mates and as long as we love each other then we can endure anything. He was there for me every time my mind wandered to the horrors that could occur. As a military spouse, it is inevitable that your mind will take you to horrible possibilities. It is something we will always have to deal with when they are at war. He and my mother were constantly reassuring me he was going to come home safe. The particular job my husband was doing prevented me from speaking or hearing from him for weeks at a time. Your mind tends to wander in moments like those. You imagine horrible things and wonder if they are ok. You wonder why you have not heard from them even though there is a reasonable explanation. Berney reminded me that my husband is a smart man and knows how to handle himself. He reminded me that I had to have faith in his capabilities as a Marine. He reminded me that I had to take one day at a time. I could not have gotten through that year without him. I also know I could not have become the woman I am today without his guidance.

Berney is a kind and gentle soul who has suffered much in his life. He is a spiritual man who has so much to give and is a blessing to who ever he crosses paths with. I could not have asked for a better step-father, and above all, a better friend.

He is there for me and hopefully always will be. It scares me to think that we could lose him. I have watched his health deteriorate these last couple of years and it scares me. His health is so fragile and to watch it slowly deteriorate is extremely painful as I cannot bare the thought of losing him. When I flew to Providence, Rhode Island to support my parents through this ordeal, I was finally witness too how bad his health had truly gotten. I was there to help them at Logan Airport and my heart sunk to my stomach when I saw them walk out into the terminal. My mom had warned me his health was really bad but I was not expecting to see him in such a condition. He no longer had color in his skin. I always thought of Berney as my jolly red Irish step-dad, since his cheeks were always red and he could not stay in the sun but a few minutes without turning red all over. That was not the man I saw walk towards me. His face was gaunt and he had lost so much weight that his suit looked as if it were ten sizes too big. He looked as if he were on his death bed. The following two weeks I spent with them were difficult. I saw the struggle my mom and he were going through to keep his blood sugar regulated. Every time he checked his blood sugar it was either sky high or frighteningly low. He constantly had to lay down as daily tasks were too much for him. His arm would constantly be in pain and I could see the distress in his eyes from it. However, it was not until I found him in the bathroom one night that I truly realized we could lose him. My mom constantly spoke of his blackouts to his dismay, as he is not a man that wants his children to know he is weak or sick. When I found him hunched over in the bathroom I did not think he was weak or sick, I thought he was dead. I ran to my mother and she went to his aid. It horrified me to think this is what they have been coping with these last couple of years. They have been constantly waiting for tests and test results. We live in constant fear from day to day that he may not survive the next. This horrifies me to no end.

My husband and I are planning on having children soon, and I can only hope that he will survive to bless there lives with his guidance and love as a grandfather. I have witnessed him with my niece and nephew and there is truly no better grandfather out there. They love him dearly. I hope my children will be lucky enough to know him. The condition his health is in now scares me they will not. It scares me because we can't lose him. He is our rock. He is my mother's soul mate. He is my dad.

Respectfully,

Lisa A. Lefringhouse

The Honorable Mary M. Lisi,
Chief Judge
United States
District of Rhode Island
One Exchange Terrace
Federal Building and Courthouse
Providence RI 02903

Re: *United States vs. Patrick Clyne*
US District Court, Criminal No.: 07-CR-00032-ML

Dear Chief Judge Lisi:

I have known the Bradley (Clyne) family since 1993 when Sean Bradley and I were roommates at the United States Air Force Academy. I first met Patrick "Berney" Clyne in 2000 when I started dating Sean's sister, Lisa who is now my wife. From that first day, Berney has always been a kind and friendly man who opened his arms to me and everyone around him.

Through the years, I have always been impressed with Berney's work ethic and his care for his family. Through our tribulations as a military family, Berney has always been a foothold that Lisa and I could anchor onto while life around us is changing day after day. We have moved to 4 different Military bases (our 5th is coming up in December) and have endured countless Temporary Additional Duties across the U.S. in addition to my one year tour in Iraq. Each and every day, Berney and Ibtisama were there to cheer us on, provide moral support for Lisa when I was not there and motivated us both to press forward in our careers.

This was especially true during my recent tour in Iraq where I spent an entire year as a member of an 11 man Military Iraqi Transition Team where I was an imbedded advisor to an Iraqi Army Battalion on the edge of the farming village of Albu Harden. Our mission was to stand up a new Iraqi Battalion straight out of Boot camp and get them operating along the Syrian Border so that the American Forces in the district could pull out and the Iraqis would be self-supporting and able to defend the villages without our assistance. Just as it sounds, this was no easy task. We could only take on such a task if our minds were focused on the job at hand knowing that everything at home was being taken care of. If my teammates and I had concerns weighing us down at home, we wouldn't have been able to operate as efficiently and as effectively as we did. But throughout that deployment, thanks to my wife, things at home ticked away like clockwork. And she certainly could not have done that without the support of Berney and my mother-in-law, Ibtisama. We had moved to Camp Pendleton, California only 5 months before my deployment and didn't know anyone on the base. But Berney and Ibtisama were there for her everyday making sure that she was emotionally stable while I was out of range of even radio communications, much less a telephone or internet contact, for a weeks at a time. For his role in that and everything else Berney has done for us, I will be eternally grateful.

Of late, I have been taken aback by Berney's medical condition. He is certainly not in any condition that I have ever seen him before. Growing up a farmer and working his way through life, he certainly has a work ethic that I admire even at his current age. He does his own home renovations, tends to his own garden, and takes on the odd jobs around the house that most people would be calling the handyman for. He is the type of man who wants to do it himself. As an example, when Lisa and I had come back to Providence for her God-daughter's christening in 2003, the summer heat had set in and Berney's all brick house had started heating up during the day. Berney had mentioned that it had come time to take the window air conditioning units out of the basement and mount them into the windows for the coming summer. While he was off running an errand, Lisa and I went into the basement and installed them because he was busy enough dealing with all the guests who had come into town for the week. When he came home and saw that we had installed them for him, I could tell that he was appreciative, but was also hurt. He is not the type of man who wants anything done for him or handed

to him out of charity. He would have life no other way. His diabetes however was visibly an issue even at that point in time.

Unfortunately, of late, his health is certainly not allowing him to do that. His constant weakness and frequent blackouts keep him from doing any of the tasks that he could do at the drop of a hat a few years ago. The last time I saw him was at my wedding in June of 2007. He was quite pale, had lost at least 50 pounds and quite frequently had to lay down to rest. He could not participate in many of the family gatherings and when he did, he was visibly straining to endure. It was especially evident during the reception.

My wife is extremely concerned and mentions to me practically everyday of her constant fears and worries in that he will not survive to see our children born. His current physical condition is one of erratic failing health and does not reflect the strong, courageous and giving man I have grown to know and see as a friend and father figure. As a Marine and the son of a 32 year Army Officer, I can only attest to his frustration of not being able to fend for himself due to his medical incapacities.

Sincerely,

Major Adam V. Lefringhouse, USMC

The Honorable Mary M. Lisi,
Chief Judge
United States
District of Rhode Island
One Exchange Terrace
Federal Building and Courthouse
Providence RI 02903

Re: *United States vs. Patrick Clyne*
US District Court, Criminal No.: 07-CR-00032-ML

Dear Chief Judge Lisi:

My name is Maya Lindstrom. I am 35-years-old, married with 2 young children, and I am one of Berney's stepdaughters. I met Berney about 11 years ago, and he has truly been a blessing to my family. I moved to upstate NY about 3-1/2 years ago, but before moving, I visited my mother Ibtisama Clyne and Berney as much as possible. It was always a relaxing visit. For the last year or so, however, it has been very stressful and very hard to watch Berney's health decline. It has really affected me emotionally. It has affected everyone close to him. It kills me to see him this way. He used to be so full of life, but even though he is in pain physically and emotionally, he still puts on a big smile and gives the warmest hugs. I do not even want to think about what my life would be like if he were not a part of it.

Berney is one of the nicest and kindest people I know. He wears his heart on his sleeve. He is understanding, funny, compassionate, patient, caring, and supportive. He has a generous soul. He always says the right things to me when I am upset. He has been more of a father to me in the last 10 years and more of a grandfather to my children than my own father. I look up to him; I seek and trust his advice. He has been there for my mother through the worst of times. He has been there for my whole family, and for that I am more than grateful. I have yet to meet anyone who has any harsh feelings towards him. My family, my friends, and especially me, all love him very much. He has shown and proven that he loves my brother, sister, and I as if we are his own children and is always there when we need him. Trust me when I say that these feelings are true and will never change. One thing that you can be sure of is that I look up to Berney not only as a father but also as a friend.

Sincerely,

Maya Lindstrom

The Honorable Mary M. Lisi,
Chief Judge
United States
District of Rhode Island
One Exchange Terrace
Federal Building and Courthouse
Providence RI 02903

Re: *United States vs. Patrick Clyne*
US District Court, Criminal No.: 07-CR-00032-ML

Dear Chief Judge Lisi:

My name is Michael Lindstrom. I am Maya's husband (one of Berney's stepdaughters). I have known Berney Clyne for approximately 10 years. Berney is a kind and reserved individual with strong moral convictions and compassion for others. Berney Clyne is the type of person who puts the welfare of others before his own. He was and continues to be the family focal point for providing moral support and words of encouragement to my wife and the rest of the family during difficult, personal times.

Upon completing my active duty military service, I began working full-time and going to college full-time. During this time period, Berney was there to support me by keeping me focused on completing my education and reminding me to balance these goals with my personal life. He has been there to offer advice and listen to my concerns when I have been faced with other career options and personal decisions. I value his opinion, respect his morals, and am thankful that he is a part of my life and my family's life.

Berney never talked a lot about his own personal experiences. However, through conversations with my wife, I found out that Berney was partly responsible for sending his children to medical school and that he experienced a horrible divorce which left him with little money and a distanced family. His humility and concern for others is a character trait that I will always respect.

Sincerely,

Michael Lindstrom

The Honorable Mary M. Lisi,
Chief Judge
United States
District of Rhode Island
One Exchange Terrace
Federal Building and Courthouse
Providence RI 02903

Re: *United States vs. Patrick Clyne*
US District Court, Criminal No.: 07-CR-00032-ML

Dear Chief Judge Lisi:

My name is Brenda Bradley, the wife of Sean Bradley, Ibtisama Bradley's only son. I have for 4 years now had the pleasure of knowing Berney Clyne. From the moment I met him I felt already welcomed and part of the family. Over the years I have had the opportunity to see how much Berney loves my husband and although they do not see each other often enough, each time we do see Berney it is as if not a day goes by since our last visit.

I had the pleasure of spending Christmas of 2004 in Rhode Island. Being so close with my own family, it was difficult for me to be so far away from them for the holiday. With Berney reminding me a bit of my own father, with whom I have a wonderful relationship, he played a large part in helping to make me feel comfortable and at home.

Berney is a calm soul. I have seen him over and over again put others before himself as well as at ease. He is constantly trying to help those around him and always offering a helping hand. His concern for the well-being of his family is apparent in his daily activities and conversations. It is especially wonderful to see his interactions with my sister-in-law, Maya's children. Jessica and Eric Lindstrom adore their grandfather, their "Grandpa Berney". It is a reciprocated love that is one of Berney's long list of wonderful attributes.

This past June, I participated in my sister-in-law's wedding, as Lisa's bridesmaid. I had not seen Berney since summer 2006 when Adam, Lisa's husband, had returned home for his two week leave from Iraq. We were able to spend a couple of days with the whole family. You could tell then that he was not as active as he had been during our previous visits. But this past June, you could truly see the impact Berney's health had on him and the whole family. He had lost so much weight and he was exceedingly pale, and the energy I was used to seeing was just not there. He spent most of the time laying down in his hotel room due to the difficulty he had breathing. We were all constantly worried and I could see the constant distress my mother-in-law was enduring. Sean and I are especially worried about his mother as Berney is the source of her strength. With his wavering health comes her constant worry and stress.

We can only hope and pray that the care that he is receiving will resort in a positive outcome. Berney means a great deal to all of us.

Sincerely,

Brenda Bradley
Brenda Bradley

The Honorable Mary M. Lisi,
Chief Judge
United States
District of Rhode Island
One Exchange Terrace
Federal Building and Courthouse
Providence RI 02903

Re: *United States vs. Patrick Clyne*
US District Court, Criminal No.: 07-CR-00032-ML

Dear Chief Judge Lisi:

I am writing on behalf of my friend, Berney Clyne . I met Bernie thru one of my closest friends, Maya, whom I met at a playgroup 7 years ago. For about 3 years after Maya and I met, we took many trips to Rhode Island to visit with Maya'a mom and Berney. Their home was always open to us and I have many wonderful memories of our time spent with them. One thing that I remember most is how my children and I were treated. We were given the same amount of love and attention that Maya and her children received. They never singled anyone out. They included us as if we were family. Berney was like another father to me.

I have known Berney for over 7 years now and from our first hello I have felt very comfortable around him. I have had many opportunities to visit with Berney at his home with my children and every time we meet he greets us with open arms. I have watched Berney embrace his step-children and step-grandchildren as his own and he treats all others as if they are family as well. Berney is a very caring man with a very gentle soul. He thinks of all others before himself and all who have ever had the honor of receiving one of Berney's hugs knows the genuine man he is. He hides nothing and gives everything.

Since Maya has moved 5 hours away I have unfortunately not been able to visit with them as before. Maya and I have still remained good friends and talk frequently on the phone and even visit each other when we can. Thru phone conversations with her she has been telling me about Berney's failing health. It saddens me to hear this because there are not many people left in this world like him. But just recently on Labor Day weekend I had the joy of being able to visit once again. I walked into Berney's home and got the same greeting that I always have. His

warm loving eyes and genuine caring hug made it seem as if no time had past. It was so nice to see him again. But it is also heartbreaking to see this once strong and healthy man in such physical and emotional pain. Although he still gets around and still tries to act strong you can see it in his face and thru his movement that his failing health is getting the most of him and the stress are definitely having a huge affect on his health conditions as well.

Sincerely,

Laurie J. Cloutier

Laurie Cloutier

The Honorable Mary M. Lisi,
Chief Judge
United States District Court
District of Rhode Island
One Exchange Terrace
Federal Building and Courthouse
Providence, RI 02906

Re: *United States vs. Patrick Clyne*
US District Court, Criminal No.: 07-CR-00032-ML

Dear Chief Judge Lisi:

I am writing on behalf of my best friend's stepfather, Patrick Clyne. I have known Clyne's stepdaughter, Lisa Lefringhouse, for over ten years and during those ten years have had numerous occasions to get to know Berney, as we all call him. He has always been a very kind hearted and generous man opening up his home to Lisa's friends and providing an amicable and pleasant surrounding. I believe that his true character is displayed in the way that he cares for the people around him, especially his family. I know he has always been a supportive and loving father to Lisa and has enabled her to grow and progress. During her most difficult times he has been a pillar of strength, understanding and comfort. Motivating her to pursue her dreams, he has exhibited compassion and thoughtfulness. He has shown to me that he is a deeply caring man who is always willing to share his sense of humor and good-natured disposition and ultimately who puts others needs in front of his own.

Lisa has constantly spoken of his failing health and while she was in Providence for two weeks she spoke of how severe it had become. She was deeply concerned and frightened by it. Berney has been her pillar of support these last few years and I know losing him would be like losing her own father. It was not until her wedding that I had the displeasure of seeing how badly his health had gotten. I had the chance to see him the summer of 2006 and he looked drastically different this past June. He was frail and pail and it seemed difficult for him to walk and carry on a conversation for any length of time. I saw the concern his family had and I know how much it scares them. Lisa did not let on, but I know first hand how much this affects her. She and her husband, Adam, talk constantly of starting a family soon and I know she is deeply worried that Berney may not survive to be a grandfather to her children. He has made a strong and positive impact on her life. I know he would be as supportive and loving to his grandchildren.

Please take all of these character strengths and his failing health into consideration while you are deciding on his sentence.

Sincerely, Janet Moscarello

Janet Moscarello

The Honorable Mary M. Lisi,
Chief Judge
United States
District of Rhode Island
One Exchange Terrace
Federal Building and Courthouse
Providence RI 02903

Re: *United States vs. Patrick Clyne*
US District Court, Criminal No.: 07-CR-00032-ML

Dear Chief Judge Lisi:

We are writing to you on behalf of Patrick "Berney" Clyne. We have known Berney for four years while serving with his son-in-law and step-daughter, Lisa Lefringhouse, at Naval Air Station Whidbey Island. During this time we have gotten to know Berney as a spiritual man who is a constant support to his family and friends. Berney is hardworking, and a caring and loving father and grandfather. He treats his children's friends as though they were his own. Your Honor, he is a good man. One who does not have malice in his heart and puts the well-being of others to the forefront of his own. He is kindhearted, loving, unselfish and a constant support to Lisa and Adam but above all a good man. A man we are proud to call a good friend. A man that we know even as friends could come to him for support.

As a military family we know the need for constant family support. We are currently enduring a military deployment as Robert is on a seven month tour in Iraq. These deployments put an emotional day-to-day strain on both parties. Family support is one of the key factors in surviving the separation. During the time Adam was deployed for a one year tour, Lisa constantly spoke of the everlasting support from Berney and her mom. She has always spoken so highly of him and I know that it was his support that helped her persevere. If you did not know Lisa's parents were divorced, you would assume Berney was her biological father, as she is already his daughter in heart and soul.

Respectfully,

Lindy Sproat

Lt. Robert and Lindy Sproat, USN

The Honorable Mary M. Lisi,
Chief Judge
United States
District of Rhode Island
One Exchange Terrace
Federal Building and Courthouse
Providence RI 02903

Re: *United States vs. Patrick Clyne*

US District Court, Criminal No.: 07-CR-00032-ML

Dear Chief Judge Lisi:

I have known Berney now for almost ten years through his association and marriage to my sister.

Throughout that period, Berney has shown himself to be a loving husband who has given my sister happiness and contentment for the first time in many, many years. He has been an exemplary step-father to her children who adore and look up to him for guidance and solace, seeking his advice before their mother's and turning to him in good times and bad.

To my family and me, Berney has proven himself to a sincere friend and a loving son and brother. We respect him as a person with integrity and are proud to call him a member of our family

Sincerely,

Taghrid Akasheh-Steityeh